IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | | |
|---|---|---|---|
| MICHELLE D. ARBOGAST | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: _____ | |
| | ) | Judge: _____ | |
| TUSCULUM COLLEGE, | ) | JURY DEMAND | |
| | ) | | |
| Defendant. | ) | | |

---

## COMPLAINT

---

COMES NOW, the Plaintiff, MICHELLE D. ARBOGAST, and she sues the Defendant, and for cause of action would show unto this Honorable Court as follows:

1.      Plaintiff, Michelle D. Arbogast, is a resident of Greene County, Tennessee.

2.      Defendant, Tusculum College, is a nonprofit Corporation with its principal address at 60 Shiloh Road, Greenville, Greene County, Tennessee, and may be served with process by its Registered Agent, CT Corporation System, 300 Montvue Road, Knoxville, TN 37919.

3.      Jurisdiction is founded upon 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit:  the Americans with Disabilities Act, 42 U.S.C. § 12102, *et seq*., the False Claims Act, 31 U.S.C. § 3729, *et seq*., and pursuant to the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Venue is proper under the code provisions cited herein, and 28 U.S.C. § 1391.

4.      The Defendant is an employer engaging in an industry affecting commerce.

5.      The Defendant employs more than twenty (20) employees in the State of Tennessee.

6.      The Defendant is an employer within the meaning of the Americans with

Disabilities Act, 42 U.S.C. § 12101, *et seq*.

7.    The Defendant is an employer within the meaning of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

8.    The Defendant is an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101.

9.    At all times stated herein, the Defendant was an employer subject to the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103.

10.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., defines "disability" as follows:

1.) Disability: The term "disability" means, with respect to an individual-
  A.)  a physical or mental impairment that substantially limits one or more major life activities of such individual;
  B.)  a record of such an impairment; or
  C.)  being regard as having such an impairment (as described in paragraph (3)).

2.) Major Life Activities:
  A.)  In general
      For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
  B.)  Major bodily functions
      For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.
  C.)  An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

11.    The Equal Employment Opportunity Commission's (hereinafter "EEOC") regulations define "impairment," in part, as:

"(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems, neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; …" 29 C.F.R. § 1630.2 (emphasis added).

12.     The EEOC's regulations define "major life activities", in part, as including, but not limited to:

"(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentration, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2 (emphasis added).

13.     Plaintiff was originally hired by the Defendant in or about 2003 and worked until 2004.

14.     Plaintiff was rehired by Defendant in July of 2006, and she was continuously employed thereafter until she was terminated on July 12, 2018 as hereinafter alleged.

15.     During her employment with Defendant, Plaintiff received raises and multiple promotions.

16.     During her employment with Defendant, Plaintiff was periodically evaluated and her evaluations were always good.

17.     During her employment with Defendant, Plaintiff was never written up.

18.     At the time of her termination, Plaintiff was employed by Defendant as the Director of Foundation and Donor Relations in Defendant's Institutional Advancement Office.

3

19.    In this role, Plaintiff supervised and obtained funding through grants and development solicitations on behalf of Defendant and also oversaw the scholarship and endowment program.

20.    During her employment, Plaintiff performed her job in a competent manner and secured Defendant significant grants that often exceeded goals set by Defendant.

21.    On February 14, 2018, Jill Salyers was hired as the Vice President of Institutional Advancement.

22.    On February 14, 2018, Jill Salyers became Plaintiff's direct supervisor.

23.    Although Plaintiff received numerous promotions and raises during her employment with Defendant, once Jill Salyers became her supervisor, Plaintiff began to be treated in a hostile and unfair manner as hereinafter alleged.

24.    After suffering years of severe physical abuse from her ex-husband, Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") in or around 2010, and she suffered from depression and anxiety.

25.    PTSD is a disability within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

26.    Depression is a disability within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

27.    Anxiety is a disability within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

28.    In 2015, Plaintiff was also diagnosed with an adrenal gland imbalance, which causes symptoms similar to her PTSD condition.

29.    Adrenal gland imbalance is a disability within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

30.    Prior to Plaintiff's termination, the Defendant was aware of Plaintiff's medical

4

conditions.

31.     In February of 2018, after Plaintiff began reporting to Jill Salyers, Plaintiff disclosed her PTSD to Ms. Salyers.

32.     In February of 2018, after Plaintiff began reporting to Jill Salyers, Plaintiff disclosed her depression disorder to Ms. Salyers.

33.     In February of 2018, after Plaintiff began reporting to Jill Salyers, Plaintiff disclosed her anxiety disorder to Ms. Salyers.

34.     In February of 2018, after Plaintiff began reporting to Jill Salyers, Plaintiff disclosed her adrenal gland imbalance disorder to Ms. Salyers.

35.     By February of 2018, Danelle Sells, Director of Personnel Services (HR), was aware of Plaintiff's PTSD.

36.     By February of 2018, Danelle Sells, Director of Personnel Services (HR), was aware of Plaintiff's depression disorder.

37.     By February of 2018, Danelle Sells, Director of Personnel Services (HR), was aware of Plaintiff's anxiety disorder.

38.     By February of 2018, Danelle Sells, Director of Personnel Services (HR), was aware of Plaintiff's adrenal gland imbalance disorder.

39.     After Plaintiff informed Jill Salyers about her medical conditions and disabilities, Ms. Salyers became cold, refused to talk to Plaintiff, and treated Plaintiff differently.

40.     After Plaintiff informed Jill Salyers about her medical condition and disabilities, Plaintiff was subjected to increased scrutiny by Ms. Salyers that was different than other employees reporting to Ms. Salyers.

41.     On May 25, 2018, Plaintiff reported to Jill Salyers that Defendant was violating the

terms of grants that were funded by federal and local governments.

42. On May 25, 2018, Plaintiff explained to Jill Salyers that the failure to follow the specific requirements of the grants was illegal and considered a misappropriation of government funds and constituted fraudulent activities, and she tried to get Defendant to abide by the grant conditions.

43. Thereafter, Plaintiff made similar complaints about Defendant's grant violations to Defendant, but her complaints were met with increased hostility by Jill Salyers.

44. Jill Salyers also made degrading and discriminatory remarks about Plaintiff's medical conditions and disabilities, and these comments were extremely hurtful and degrading to Plaintiff.

45. On May 29, 2018, Plaintiff complained to Danelle Sells in HR about Jill Salyers' discriminatory and retaliatory conduct.

46. Danelle Sells agreed that Jill Salyers was "creating a hostile work environment" for Plaintiff, but Ms. Sells failed to take any action in response to Plaintiff's complaints.

47. Plaintiff also informed Danelle Sells that Jill Salyers' hostile and discriminatory behavior towards Plaintiff was causing increased stress and panic attacks and was worsening her depression and PTSD.

48. As a result, during the meeting on May 29, 2018, Plaintiff requested the reasonable accommodation of transferring to a different position in Academic Affairs.

49. This transfer was reasonable and possible, but Plaintiff was denied the opportunity to transfer.

50. A transfer would have been a reasonable accommodation to accommodate Plaintiff's medical condition and disabilities.

51.     Transferring the Plaintiff to a different position in Academic Affairs would have been a reasonable accommodation within the meaning of the ADA, 42 U.S.C. § 12101, *et seq.*

52.     Transferring the Plaintiff to a different position in Academic Affairs was possible.

53.     However, the Defendant refused to engage in the interactive process in good faith to accommodate Plaintiff's medical condition and disabilities.

54.     Due to Jill Salyers ongoing hostile and abusive treatment, Plaintiff scheduled another meeting with Danelle Sells in HR for July 6, 2018, and Plaintiff placed it on her calendar, but the more she thought about it, Plaintiff decided the meeting could not wait, and she met with Ms. Sells the afternoon of July 5, 2018.

55.     During the meeting on July 5, 2018 with Danelle Sells, Plaintiff again complained about the discriminatory treatment and retaliatory conduct, and Plaintiff stated she wanted to file a formal grievance due to the hostile and discriminatory work environment.

56.     During the meeting on July 5, 2018 with Danelle Sells, Plaintiff also again requested the reasonable accommodation of a transfer.

57.     In response, Danelle Sells discouraged Plaintiff from filing the grievance and further told Plaintiff that she could not transfer positions if she filed the grievance.

58.     During the meeting on July 5, 2018, Danelle Sells was aware and/or had knowledge that Plaintiff wanted to be transferred.

59.     As a result, Plaintiff did not file the formal grievance against Jill Salyers in reliance on Ms. Sells' representations that filing a grievance would prevent Plaintiff from being able to transfer.

60.     Since Plaintiff had already met with Danelle Sells, she removed the scheduled meeting for the following day from her calendar.

61.     The next day, July 6, 2018, Jill Salyers demanded in a threatening tone that Plaintiff tell her who the meeting was with and what was it for.  Plaintiff was shocked by this reaction and only told her that it was a personal meeting.

62.     It was clear to Plaintiff that Jill Salyers was aware Plaintiff had complained about her discriminatory and retaliatory conduct.

63.     A few days later, on July 12, 2018, the Plaintiff and Jill Salyers were scheduled to meet regarding Ms. Salyers' first evaluation of Plaintiff.

64.     However, instead, the Plaintiff was abruptly terminated on July 12, 2018.

65.     Plaintiff was given no cause for her termination, and her evaluations had been positive up to this point.

66.     During the termination meeting on July 12, 2018, Jill Salyers merely said Plaintiff does not fit with the team she was building.

67.     Plaintiff responded that Jill Salyers created a hostile work environment, and that she unfairly scrutinized Plaintiff and treated her differently than other employees.

68.     Plaintiff also complained that she made degrading and discriminatory remarks about her disabilities, including calling her "monkey brains" or asserted that Plaintiff did not understand anything.

69.     Jill Salyers did not deny that she made these comments.

70.     At the time of Plaintiff's termination, she was given a Confidential Separation Agreement and Release signed by Defendant's President, Dr. James Hurley, offering her a Settlement payment provided she signed the Separation Agreement and Release, which released the Defendant from any and all claims, but Plaintiff did not sign this.  (Separation Agreement and Release, attached hereto as Exhibit 1).

71.     On or before July 12, 2018, Jill Salyers was aware and/or had knowledge of Plaintiff's complaints of discrimination.

72.     On or before July 12, 2018, Danelle Sells was aware and/or had knowledge of Plaintiff's complaints of discrimination.

73.     On or before July 12, 2018, Jill Salyers was aware and/or had knowledge of Plaintiff's request to transfer to a different position.

74.     On or before July 12, 2018, Danelle Sells was aware and/or had knowledge of Plaintiff's request to transfer to a different position.

75.     Plaintiff was terminated due to her disability, and/or because she was regarded as disabled, and/or because she had a record of impairment, and/or because she needed a reasonable accommodation, and/or in retaliation for complaining of discrimination and/or hostile treatment, and/or in retaliation for requesting a reasonable accommodation, and/or because Defendant refused to provide her with a reasonable and possible accommodation, and/or because Defendant refused to engage in the interactive process regarding her request for a reasonable accommodation in good faith in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.  As such, Plaintiff was terminated in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*., and she sues Defendant for violating said statutes.

76.     Additionally and/or alternatively, Plaintiff was terminated in retaliation for complaining about, and trying to stop, Defendant's actions that violated the conditions of the grants imposed by the United States government and/or by the State of Tennessee, and constituted fraudulent activities.  As such, Plaintiff was terminated in violation of the False Claims Act, 31

9

U.S.C. § 3729, *et seq.*, and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, and she sues the Defendant for violating said statutes.

77.     Further, Plaintiff was subjected to a hostile work environment during her employment.

78.     As a result of the above conduct, Plaintiff sues Defendant for violating the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103, *et seq.*, the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*, and the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

79.     As a result of the discriminatory and retaliatory actions set forth herein, the Plaintiff filed a timely Charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (A true and exact copy of the Charge is attached as Exhibit 2, and same is incorporated herein by reference).

80.     The EEOC Charge (Exh. 2) filed by Plaintiff was timely filed.

81.     All grant recipients must follow the conditions of the grants honestly and ethically.

82.     Employers, like Defendant, must conduct fair, honest, and unbiased investigations.

83.     Employers, like Defendant, have a duty to eradicate discrimination in the workplace.

84.     Employers, like Defendant, must not discriminate against employees due to a disability.

85.     Employers, like Defendant, must not retaliate against employees for complaining of discrimination or illegal activity.

86.     The Plaintiff received a Notice of Right to Sue from the EEOC dated April 25,

2019. (A copy of which is attached hereto as Exhibit 3).

87. This suit is timely filed.

88. On November 28, 2019, Plaintiff's attorney sent Defendant a Notice of Non-Spoliation. (A copy of which is attached hereto as Exhibit 4).

89. Defendant thereafter received the Notice of Non-Spoliation (Exh. 4).

90. As a direct and proximate result of the Defendant's actions as alleged herein, the Plaintiff suffered great and irreparable loss of tangible job benefits, including a loss of income and benefits, both past and future, and she sustained other pecuniary losses.

91. As a direct and proximate result of the Defendant's actions as alleged herein, the Plaintiff has sustained, and will continue to sustain, great emotional distress, and humiliation and embarrassment, damage to reputation and character.

92. Defendant's conduct as alleged herein was in reckless disregard to Plaintiff's federally protected rights such as to justify the imposition of substantial punitive damages.

93. Defendant's actions were reckless, intentional, and malicious sufficient to justify an award of substantial punitive damages.

WHEREFORE, Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay (or, in the alternative, reinstatement if the Court deems it appropriate, Plaintiff respectfully submits that given Defendant's actions as alleged herein, that reinstatement would not be appropriate).

2. One times back pay pursuant to the False Claims Act 31 U.S.C. § 3729, *et seq*.

3. Punitive damages pursuant to the ADA.

4. Punitive damages pursuant to Tennessee Common Law.

5. Prejudgment interest.

6.      Reasonable attorney's fees.

7.      The costs of this action.

8.      A jury to try this cause.

9.      A mandatory injunction to issue prohibiting the Defendant from engaging in disability discrimination, and ordering Defendant to abide by all conditions of their federal and state grants.

RESPECTFULLY SUBMITTED this the 10th day of July, 2019.

**THE BURKHALTER LAW FIRM, P.C.**

s/D. Alexander Burkhalter, III
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Zachary J. Burkhalter, BPR #035956
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974